FILED
2022 DEC 28 AM 11:59
CLERK
U.S. DISTRICT COURT

RECEIVED
2022 DEC 28 AM 8:29
CLERK
U.S. DISTRICT COURT

**DAVID J. HOLDSWORTH (4052)**
Attorney for Plaintiff
9125 South Monroe Plaza Way, Suite C
Sandy, UT 84070
Telephone (801) 352-7701
Facsimile (801) 567-9960

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| TRESEA SNOW, | : | **COMPLAINT** |
| | : | **(JURY TRIAL DEMANDED)** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BECTON, DICKINSON AND | : | |
| COMPANY, BECTON DICKINSON | : | |
| INFUSION THERAPY SYSTEMS, | : | |
| INC., B.D. LEAVE AND DISABILITY | : | |
| SERVICE CENTER, SEDGWICK | : | |
| CMS, and METROPOLITAN LIFE | : | |
| INSURANCE COMPANY, | : | Civil No.: 2:22−cv−00811- JNP |
| | : | |
| Defendants. | : | Honorable |

COMES NOW, the Plaintiff Tresea Snow (hereinafter "Ms. Snow"),

complains of Defendants Becton, Dickinson and Company, Becton Dickinson Infusion

Therapy Systems, Inc., B.D. Leave and Disability Service Center, Sedgwick CMS, and

Metropolitan Life Insurance Company, and, as and for causes of action, alleges as

follows:

## I. PARTIES

1.      Plaintiff Tresea Snow is a citizen of the United States, who, at all times relevant hereto, was a resident of the State of Utah.

2.      At all times relevant hereto, Plaintiff was employed by Becton, Dickinson and Company (hereinafter sometimes referred to as "B.D.").  B.D. is a business which does business in Salt Lake County, Utah.

3.      Plaintiff alleges B.D. handled requests for leaves of absence and claims for disability insurance through the B.D. Leave and Disability Service Center.

4.      On information and belief, Plaintiff alleges Sedgwick CMS is a third-party administrator of B.D.'s group disability insurance benefits.

5.      On information and belief, Defendant Metropolitan Life Insurance Company (hereinafter "MetLife") is an insurance company which does business in the State of Utah.

6.      On information and belief, Plaintiff alleges MetLife provides group long-term disability insurance coverage and benefits to qualifying employees of B.D., pursuant to employee group health and welfare plans adopted by B.D. and provided by B.D. to its employees as a benefit of their employment.

7.      On information and belief, Plaintiff alleges that MetLife is the "plan administrator" for B.D.'s group long-term disability insurance plans and

administers the above-described long-term disability insurance plans for employees of B.D. who apply for and qualify for benefits under such plans.

## II.  JURISDICTION

8.      Ms. Snow brings this action pursuant to the Employee Retirement Income Security Act of 1974, ("ERISA"), as amended, 29 U.S.C. § 1001, et seq. Jurisdiction is based on federal question, 28 U.S.C. §§ 1331, 1332 — namely, the interpretation and application of various provisions of the ERISA and, specifically, § 502 (e) (1), 29 U.S.C. § 1132 (e) (1).

## III.  VENUE

9.      Venue in this Court is proper in that the causes of action alleged herein arose in the Federal District of Utah, ERISA § 502 (e) (2), 29 U.S.C. § 1132 (e) (2), and/or the office of B.D. where Plaintiff works is located in the State of Utah, and/or the Plans and employment records relevant to Plaintiff's claims may be found in the State of Utah, and/or the Plans required civil actions regarding claims for benefits under the Plans to be filed in the federal district of Utah.

## IV.  STATEMENT OF FACTS

### A.  MS. SNOW'S EMPLOYMENT WITH B.D. AND COVERAGE

10.      Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 11 above as if alleged in full herein.

3

11.     At all times relevant hereto, Ms. Snow was employed with B.D. As a B.D. employee, Plaintiff was covered by and/or had elected to be covered by B.D.'s group short-term disability and long-term disability Plans.

## B.  MS. SNOW'S JOB AND THE DUTIES AND PHYSICAL REQUIREMENTS OF HER JOB

12.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 13 above as if alleged in full herein.

13.     At the time of the events alleged herein, Ms. Snow worked as a process control operator (or product control operator) for B.D.

14.     From her lengthy experience in this field and in her position for B.D., Ms. Snow alleges her job required technical expertise in terms of both knowledge and skill, in order to be able to perform such tasks as regular attendance, observing and evaluating processes and information, attention to detail, performing quality control checks, troubleshooting problems and developing and implementing solutions to problems, training employees, closing out work orders.  Physically, the job involved sitting for approximately six hours per day, walking around six hours per day (Plaintiff generally worked 12-hour shifts), keyboarding, computer work, phone work, frequent standing, frequent walking, lifting up to 25-30 lbs, carrying up to 6 lbs, occasional grasping, pushing, twisting, bending, stooping, kneeling and crouching.  Mentally, the job also required high-level analytical abilities, communication, and "people" skills,

4

reading, and working constructively with coworkers, supervisors and managers in a fast-paced, demanding work setting.

### C.  MS. SNOW'S MEDICAL IMPAIRMENTS

15.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 16 above as if alleged in full herein.

16.    Plaintiff alleges that, for several years prior to the 2018/2019 time frame, she has suffered from several serious health conditions/impairments, including functional urinary incontinence, a deviated urethra, colitis, chronic abdominal pain, frequent diarrhea, dyssynergic defecation, fecal incontinence, visceral hypersensitivity and frequent dehydration.

17.    All of such serious health conditions and impairments fall within the category of "illness" (or "illnesses") or "sickness" (or "sicknesses"), as the Plans use that term.

18.    Plaintiff alleges that, in September 2018, her gastrointestinal and urological impairments began to be even more limiting than they had been in the past, seriously impairing her ability to stay on task during a full work shift, and, thus, her impairments began to be even more limiting to her ability to work than they had been in the past.

19.     Such serious health conditions, impairments and sicknesses substantially limited Ms. Snow's ability to engage in strenuous physical exertion and to concentrate, analyze data, think through problems, develop solutions to problems, communicate, multitask, interact with others and follow through to complete tasks in a timely and satisfactory manner.

20.     By September 2018, Ms. Snow's serious health conditions and impairments and sicknesses had worsened so significantly that her serious health conditions and impairments were causing her to miss parts of many days and many full days.  She eventually became unable to perform the material and substantial duties of her job and occupation on a regular, productive and sustained basis.

21.     On information and belief, Ms. Snow alleges that, due to the same sickness(es), she began to experience a twenty-percent (20%) or more loss in her indexed monthly earnings.

### D.  MS. SNOW'S APPLICATION FOR SHORT-TERM DISABILITY INSURANCE BENEFITS, DENIAL, APPEAL AND APPROVAL

22.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 21 above as if alleged in full herein.

23.     In September 2018, because of the situation with her health described above, Ms. Snow applied for FMLA leave beginning September 18, 2018.

24.     At about the same time, Ms. Snow applied for short-term disability insurance benefits with the B.D. Leave and Disability Center.

25.     By letter from B.D. Leave and Disability Service Center ("BDLDSC"), dated October 3, 2018, B.D. denied Ms. Snow's claim for short-term disability insurance benefits.

26.     Ms. Snow appealed such denial.

27.     By BDLDSC letter to Ms. Snow, dated October 25, 2018, BDLDSC acknowledged receipt of Ms. Snow's appeal of the denial.

28.     At some point thereafter, B.D. approved Ms. Snow's claim for short-term disability insurance benefits and paid her short-term disability insurance benefits from September 28, 2018 through March 21, 2019.

29.     Thereafter, Ms. Snow's physical impairments continued to worsen. Due to such sicknesses, she had serious challenges in trying to regain the ability to work and perform the material and substantial duties of her job and occupation on a full-time, or even part-time, productive, sustained basis, and never did regain that ability.

### E.  MS. SNOW'S ADDITIONAL APPLICATION FOR LONG-TERM DISABILITY INSURANCE BENEFITS AND INITIAL DENIAL

30.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 29 above as if alleged in full herein.

31.     Ms. Snow alleges that, on or about March 19, 2019, Ms. Snow applied for long-term disability insurance benefits with MetLife.

32.     At the time she applied for long-term disability benefits, each of Ms. Snow's treating health care providers independently opined that Ms. Snow was unable to perform the material and substantial duties of her job and occupation on a regular, productive and sustained basis.

33.     Given Ms. Snow's application for long-term disability insurance benefits, MetLife had a contractual obligation to fully and fairly develop the record.  To fulfill this obligation, MetLife had an obligation to determine what Ms. Snow's serious health conditions, impairments and sicknesses were and whether any, some, or all of Ms. Snow's serious health conditions, impairments and sicknesses created functional limitations which precluded her from performing the material and substantial duties of her job, her occupation or any full-time work, on a regular, productive, sustained basis.

34.     To discharge that contractual obligation, MetLife had a duty to do more than just review Ms. Snow's medical records, it had a duty to fully and fairly develop "the record".  For example, if MetLife concluded that Ms. Snow's medical records did not contain enough objective testing or enough objective medical evidence of diagnosed sickness(es) or enough objective evidence of functional limitations, it had a duty to obtain such testing and evidence.

8

35.     Ms. Snow alleges MetLife failed to do so.

36.     By means of a letter to Ms. Snow dated April 3, 2019, MetLife informed Ms. Snow that it had decided that the medical information which Ms. Snow had provided for review was insufficient to support approval for and payment of long-term disability insurance benefits and so informed Ms. Snow that it was denying her claim for her long-term disability benefits. In said letter, MetLife explained that, based on the medical information received, it "does not support physical functional limitations during the elimination period through your benefit start date of March 19, 2019 and beyond".

37.     Ms. Snow alleges that said decision and letter informed Ms. Snow of her right to request a review of the [denial of the] claim by sending in a written request within 180 days.

## F. MS. SNOW'S INVOLVEMENT IN METLIFE'S APPEAL PROCESS AND FINAL DENIAL

38.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 37 above as if alleged in full herein.

39.     Ms. Snow strongly disagreed with the findings and conclusions set forth in MetLife's letter of April 3, 2019.  Accordingly, by letter from Ms. Snow to MetLife dated April 15, 2019, Ms. Snow appealed MetLife's April 3, 2019 denial. With said letter, Ms. Snow submitted updated and new medical information and

9

additional factual and legal argument as to why she qualified for long-term disability

insurance benefits under the MetLife Plan.

40.     Plaintiff alleges she does not know if MetLife ever acted on her

appeal.  She alleges submitted herewith never received an approval or denial on her

appeal.  Plaintiff assumes that MetLife denied her claim, but when it did so and why it

did so, is not known to Plaintiff.  Plaintiff is proceeding with this claim based on the

assumption that MetLife either denied the appeal or constructively denied it by not

acting on it.

41.     Petitioner alleges that, during this same process, she applied for

disability insurance benefits with the Social Security Administration.  She alleges the

Social Security Administration eventually approved her application for Social Security

Disability Insurance benefits.  Plaintiff alleges that, although the Social Security

Administration's Decision – Fully Favorable is not binding on MetLife with respect to

her claim for long-term disability insurance benefits, the fact that the federal

government agency most familiar with evaluating claim for disability insurance benefits

has determined that she is not able to work, is strong evidence of her inability to work.

### *MetLife's Flawed Methodology in Evaluating and in Deciding Ms. Snow's Appeal*

42.     In making her appeal, Ms. Snow asserted, generally, that her job

required her to sit, stand, walk, lift, carry, push and pull, to maintain regular attendance,

to focus and concentrate, to remember and apply specialized knowledge and skill, to work in a fast-paced environment, to show up for work on a regular basis, and to perform competently and generate outcomes at an acceptable level of productivity (quality and quantity) and to sustain such work for long (12 hour) shifts and for long periods of time.  Ms. Snow asserted that her several physical impairments substantially limited her ability to do all of the above.  Ms. Snow asserted that, as of approximately March 28, 2019, as a result of her physical health impairments and sicknesses, she could no longer perform the material and substantial duties of her job/occupation on a regular, productive, and sustained basis.

43.     In her appeal, Ms. Snow also submitted a number of pieces of medical evidence which provided an objective basis for (a) her diagnoses of her multiple physical impairments; (b) what those impairments were causing in terms of functional limitations; and (c) how such functional limitations were preventing and precluding her from performing the material and substantial duties of her job/occupation or any occupation on a regular, productive and sustained basis.

44.     Each of Ms. Snow's treating physicians independently supported and endorsed Ms. Snow's claim for long-term disability insurance benefits.

45.     On information and belief, Plaintiff alleges that, faced with this evidence, MetLife did not (a) request Ms. Snow to attend an in-person medical

examination with a physician specializing in gastrointestinal and/or urological health of MetLife's choosing; or (b) require Ms. Snow to undergo any objective testing; or (c) require Ms. Snow to participate in a phone and video interview with such a physician; or (d) require Ms. Snow to participate in a functional capacity evaluation; or (e) require Ms. Snow to undergo a vocational assessment.

46.     Ms. Snow was participating in treatment on a regular basis and was experiencing many signs and symptoms listed above.  On information and belief, Plaintiff alleges MetLife did not have an interview with any of Ms. Snow's medical providers.

47.     MetLife did not support its denial with an opinion from a medical provider who had actually examined or interviewed Ms. Snow or interviewed any of her medical providers who supported the denial proposition.

48.     However, even if the Plan supports MetLife's proposition that the only way one can establish ongoing disability is if the claimant's medical records cover all of such topics, she alleges her evidence meets that test.

49.     On information and belief, Plaintiff alleges that the medical providers who were most familiar with Ms. Snow's condition and situation have each, independently, opined that Ms. Snow's gastrointestinal and urological sicknesses were precluding her from being able to perform the material duties of her job and occupation.

(And Ms. Snow's earnings since the onset of her disability are non-existent, so, obviously, are less than her adjusted pre-disability earnings). Under these circumstances, Ms. Snow alleges that any decision on her appeal, other than an approval for long-term disability benefits after March 21, 2018, is arbitrary, capricious, an abuse of discretion and unreasonable.

50.     For example, treating physician, Jeffrey A. Ayers, D.O., given his long clinical experience with Ms. Snow (in-person clinical interviews with a trained eye), and based on his longitudinal experience with Ms. Snow, explained that he was of the opinion that Ms. Snow could no longer engage in full-time, competitive, productive work.

51.     MetLife did not ask Dr. Ayers to provide any additional clinical evidence or perform any additional objective testing (and so he did not do so).

52.     Then, again, quite predictably enough, MetLife (which did not ask or suggest to Dr. Ayers that he provide any additional clinical evidence) discounted Dr. Ayers' opinion.

53.     For example, treating provider, Natalie Ellis, P.A.-C., given her long clinical experience with Ms. Snow (in-person clinical interviews with a trained eye), and based on her longitudinal experience with Ms. Snow, explained that she was

of the opinion that Ms. Snow could no longer engage in full-time, competitive, productive work.

54.    MetLife did not ask P.A.-C. Ellis to provide any additional clinical evidence or perform any additional objective testing (and so she did not do so).

55.    Then, again, quite predictably enough, MetLife (which <u>did not</u> ask or suggest to P.A.-C. Ellis that he provide any additional clinical evidence) discounted P.A.-C. Ellis' opinion.

56.    On information and belief, Plaintiff alleges MetLife did not affirmatively investigate Ms. Snow's medical conditions or what her medical conditions caused in terms of functional limitations or whether any of such functional limitations precluded the ability to perform the material and substantial duties of her job/occupation on a full-time basis at an acceptable level of productivity and sustainability, but simply took the medical records (which Ms. Snow's <u>treating physicians had prepared to document diagnosis and treatment and not to support a claim for disability insurance benefits and which did not focus on Ms. Snow's job or determining any functional limitations on Ms. Snow's ability to work or identify any work restrictions</u>), gave them to a file reviewer (an "appeals reviewing physician"), and asked the appeals reviewing physician to determine if such medical records contained objective evidence supporting the existence of impairments generating functional

limitations precluding Ms. Snow's ability to perform the material and substantial duties of her regular occupation.

57.     Thus, what MetLife did (as most carriers do), was refer the "file" to a "file reviewer" to determine if the medical documentation (which Ms. Snow's providers <u>had prepared for purposes of diagnosis and treatment, but had not prepared to support a claim for long-term disability insurance benefits or to identify functional limitations or to identify work restrictions</u>), supported her claim for long-term disability insurance benefits.

58.     Because Ms. Snow's treating providers had prepared their medical records to document diagnosis and treatment, and not to support Ms. Snow's claim for disability insurance benefits, MetLife's file reviewing physician — no surprise here — opined that the treating physicians' records did not provide sufficient objective or clinical evidence to support functional limitations precluding Ms. Snow from performing of the material and substantial duties of Ms. Snow's job and occupation after March 21, 2019.

59.     So, the file reviewer's opinion became more about the content of the treating physicians' records than about whether Ms. Snow was disabled within the meaning of the Long-Term Disability Plan.

60.     MetLife's file reviewer did not examine Ms. Snow, did not perform any tests on Ms. Snow, did not even interview Ms. Snow, did not communicate with any of her medical providers, however, MetLife asserts that such file reviewer apparently reviewed some or all of Ms. Snow's medical records (which her providers had prepared for purposes of diagnosis and treatment and <u>not</u> for purposes of supporting a claim for disability insurance benefits).

61.     Because MetLife decided that the medical records (which the treating physicians had prepared for purposes of diagnoses and treatment and not to support a claim for long-term disability insurance benefits), did not contain sufficient objective medical evidence of impairment in Ms. Snow's body to cause functional limitations (such as the loss of ability to concentrate and remember) to such a degree as to be incompatible with Ms. Snow being able to perform the material and substantial duties of her job/occupation, and because MetLife did not make any efforts to obtain whatever objective medical evidence it might have deemed necessary to obtain or ascertain whether Ms. Snow's limitations were disabling, MetLife, presumably denied Ms. Snow's claim for long-term disability insurance benefits.  In other words, MetLife undertook no efforts to develop the record in this area and simply decided that the medical records (which her providers had prepared for purposes of diagnosis and treatment and not for purposes of supporting a claim for disability insurance benefits)

did not contain sufficient objective, clinical medical support for Ms. Snow's

impairments and functional limitations to allow it to approve her application for long-

term disability insurance benefits after March 21, 2019 and to pay such benefits.

### G.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

62.     Plaintiff incorporates by this reference all allegations listed in

paragraphs 1 through 61 above as if alleged in full herein.

63.     Plaintiff alleges she did appeal MetLife's denial of April 3, 2019.

64.     Ms. Snow alleges she has exhausted her administrative remedies

under the Long-Term Disability Plan.

65.     Ms. Snow alleges that MetLife's methodology and decision to

presumably deny her claim for long-term disability benefits after March 21, 2019 is

arbitrary, capricious, an abuse of discretion and unreasonable in that, among other

things, MetLife did not fully and fairly develop the record, did not correctly evaluate

her physical impairments, did not fairly evaluate her functional limitations and did not

correctly apply the Plan's definitions to the employment and medical facts.

66.     Thus, Ms. Snow alleges MetLife's decisions to presumably deny

her claim for long-term disability insurance benefits after March 21, 2019 and not pay

her long-term disability benefits after March 21, 2019 constitutes a violation of her

rights under ERISA.

67.     Given what Ms. Snow believes to be MetLife's denial, she has a right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974.  By filing the instant civil action, she is doing just that.

## H.  GROUNDS FOR JUDICIAL REVIEW

### *Ms. Snow's Physical Impairments*

68.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 67 above as if alleged in full herein.

69.     To summarize, Ms. Snow suffers from the following physical impairments: gastroesophageal reflux disease, inflammatory bowel disease, colitis, chronic abdominal pain, irregular bowel habits, chronic kidney disease, chronic constipation alternating with chronic diarrhea, dyssynergic defecation, rectal bleeding, visceral hypersensitivity, and pelvic floor dysfunction.

### *How Ms. Snow's Impairments Cause Functional Limitations and How Those Functional limitations Preclude her Ability to do her Job*

70.     Ms. Snow's physical impairments cause many functional limitations (Ms. Snow describes these in her own words), which preclude Ms. Snow from performing the duties of Ms. Snow's job/regular occupation:

| **Job Duties** | **Impairment** | **Functional Limitation** |
|---|---|---|
| sitting, standing, walking, lifting, carrying, pushing, pulling | abdominal pain<br>back pain | chronic abdominal and pelvic pain, sitting limited to 30 minutes to an hour if the chair is an ergonomically correct chair, less if the chair is not ergonomically correct, pain limits my ability to sit stand and walk. I can move some, but I am badly hampered by my sickness |
| maintaining regular attendance, punctuality and productivity | causing need to be close to and spend inordinate amount of time in restroom | when the pain is severe, I was not able to concentrate and I was distracted by the pain, I am not able to do anything |
| staying on task 95% to 100% of the workday | need for frequent trips to restroom, pain | constant pain and exhaustion are distractions for anyone, and these distractions kept me from being on task at the level to which I was accustomed and my job required. |
| performing in a competent and fast manner | need for frequent trips to restroom, pain | my health conditions made it difficult for me to get going in the morning, these distractions slowed my responsiveness to all of the issues that arose in the course of my work |

| Job Duties | Impairment | Functional Limitation |
|---|---|---|
| ability to remember and complete complex projects, solve problems | pain, distraction | I was having difficulty in maintaining concentration and staying on task |
| interact constructively with coworkers and supervisors | | I was becoming sluggish, non-responsive and slow. People could see that I was suffering. |

71.     Thus, in late 2018 and early 2019, Ms. Snow's physical impairments caused limitations in engaging in physically exertional activities and in concentrating, thinking, remembering, staying on task and following through.  They impaired Ms. Snow's ability to be regular in attendance.  They eroded her ability to perform at a high level of competence and speed.  They reduced her ability to interact constructively with her colleagues.  They took her of out of workplace for several days a month.

72.     Ms. Snow respectfully alleges that the objective medical information previously submitted does support the existence of (a) multiple physical impairments which were and which would reasonably be expected to continue to cause (b) multiple and significant functional limitations (including, but not limited to, pain, fatigue, difficulty engaging in any physically strenuous exertions, and in concentrating, thinking, remembering, analyzing and solving problems in a productive manner, (c)

20

which functional limitations were preventing Ms. Snow from performing the material

and substantial duties of her job and occupation at an acceptable level of productivity,

such as maintaining regular attendance, staying on task for several hours a day,

performing at a satisfactory level of quantity and quality and  productivity for eight to

12 hours a day, five days in a week on a sustained basis, week after week, month after

month.

73.     Ms. Snow challenges both MetLife's methodology and decision as

being unreasonable.

74.     The test is whether Ms. Snow's sickness(es) prevented Ms. Snow

from performing one or more of the material and substantial duties of her

job/occupation (including the ability to work the number of hours [required] in [her]

work shifts and in her regularly scheduled workweek).

75.     Ms. Snow alleges the file reviewing physician mis-evaluated her

medical evidence of impairments.

76.     Ms. Snow alleges the file reviewing physician mis-evaluated her

functional capacity.

77.     Ms. Snow alleges the file reviewer, not surprisingly, opined that

the records of Ms. Snow's treating providers (which they had prepared to focus on

diagnosis and treatment, and not on a patient's activities of daily living or ability to

work on a regular, productive and sustained basis, or on eligibility for long-term disability insurance benefits) are not consistent with <u>complete inability to work in any job</u>.  But that's not the test in the Plan at issue.

78.     Ms. Snow concedes that the Plan does require some proof of a sickness, but alleges that the Plan does not require such to be established or manifested only by objective medical evidence.  Accordingly, Ms. Snow alleges that she may establish the existence of her sicknesses and the functional and employment/vocational implications of her sicknesses by a host of different types of information and that no one type of information (such as objective medical evidence) is necessary or dispositive.

79.     Ms. Snow alleges that, essentially, the contours of the dispute as to whether Ms. Snow's medical and employment/vocational facts satisfy the definition of disability in the Long-Term Disability Plan, seems to be as follows: (1) MetLife is likely interpreting the definition of disability as requiring a sickness to be manifested solely by objective medical evidence; and (2) MetLife is also requiring not only the existence of a sickness to be established by objective medical evidence, <u>but is also requiring the restrictions and limitations which such sickness causes to be tested, documented, and measured by objective medical evidence</u>, regardless of the practicalities or costs involved on the part of the claimant; and (3) such objective

medical evidence must establish not only that Ms. Snow cannot work in her regular occupation, but in any job.

80.     MetLife assumed that the treating doctor(s)' records would probably not contain that kind of "objective" information (which they usually don't), and so employed a file reviewer to review of the medical records, and, then, after receiving the file reviewer's opinion that the medical providers' records (which they had not prepared to support a claim for long-term disability insurance benefits) di dnot support Plaintiff's claim for long-term disability insurance benefits, and, then, denied the claim based on the file reviewer's review of the file.

81.     MetLife (and its file reviewer) did not generate objective medical evidence, such as by requiring Ms. Snow to undergo well recognized objective tests or any functional capacity evaluation.

82.     By employing such a methodology, MetLife can develop what appears to be a bona fide rationale to justify its denial.  And because denying the claim for long-term disability benefits cuts off a source of income which the claimant was counting on, the claimant, who now realizes that MetLife is requiring additional objective medical information to prove up her claim, now has no money with which to pay for the type of objective medical evidence MetLife is demanding.

83.     Thus, Ms. Snow alleges that MetLife's process of denying her claim and appeal based solely on a file reviewer's review of the medical records is arbitrary, capricious, an abuse of discretion and unreasonable, and, therefore, a violation of the Long-Term Disability Plan and ERISA.

84.     Disability insurance carriers may properly focus on the link between a claimant's sickness(es) and the implications of such on the claimant's ability to perform the material and substantial duties of the claimant's regular occupation. That's the core issue in any disability claim.

85.     Ofttimes, however, to decide that issue, a disability insurance carrier will just have a physician review the claimant's medical records (which were prepared to support diagnosis and treatment, but not prepared to support a claim for disability insurance benefits), to see if those records support the claimant's claim for disability insurance benefits (which they often don't because physicians are focused on diagnosis and treatment and responses to treatment, not functional capacity), and not examine the claimant or interview the claimant or communicate with claimant's treating providers or perform any additional objective testing or functional capacity evaluation or vocational assessment.

86.     Thus, if a busy treating physician's records indicate that the physician has been focusing on diagnosis and treatment and did not perform expensive

24

and exhaustive additional "objective" testing or, evaluate and document a patient's functional deficits or to focus a substantial amount of time explaining how such functional limitations might affect a claimant's ability to work in her particular job or occupation (as opposed to focusing on diagnosis and treatment), such provides an "easy out" for a carrier to deny a claim because of supposed deficiencies in the treating physician's medical records (which are usually going to be deficient in that respect).

87.     In any event, in the instant case, the file reviewer based his opinion on medical records which were prepared for purposes of diagnosis and treatment and not prepared for the purpose of generating dispositive objective medical evidence to support Ms. Snow's claim for long-term disability benefits.[1]  Accordingly, Ms. Snow alleges MetLife's evaluation opinion is incomplete and flawed.  And, consequently, Ms. Snow alleges MetLife's decision is arbitrary and capricious and abuse of discretion and unreasonable.

88.     Thus, Ms. Snow appeals and files this Complaint seeking judicial review of MetLife's denial.

## V.  DAMAGES

---

[1]Sometimes a file reviewer, while not examining the claimant, will reach out to the treating physician(s).  These doctor-to-doctor communications (if they occur at all) may or may not be terribly productive.  A treating physician may not appreciate having her medical record documentation questioned or, being second guessed, or, if the treating physician comes on too strongly in favor of eligibility, being accused of having lost her or her objectivity.  He or she is placed in a no-win situation.

89.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 88 above as if alleged in full herein.

90.     MetLife's denial has caused Ms. Snow the loss of long-term disability insurance benefits to which she is eligible.  Such denial has caused Ms. Snow substantial financial loss and stress.

91.     Such denial has also substantially aggravated Ms. Snow's physical and mental impairments.

92.     Such denial has caused other consequential damages.

93.     Such denial has also necessitated that Ms. Snow hire an attorney and incur attorneys fees and court costs.

## VI.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FOR A DECLARATION THAT METLIFE'S
### DECISIONS AND DENIAL WERE ARBITRARY AND CAPRICIOUS,
### AN ABUSE OF DISCRETION AND UNREASONABLE

94.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 93 above as if alleged in full herein.

95.     During its processing of Ms. Snow's request for review, MetLife did <u>not</u> examine Ms. Snow or inquire of Ms. Snow as to the severity of her conditions, or what her conditions caused in terms of restrictions and limitations as to her ability to perform the material and substantial duties of her regular occupation.   Then, based on

its review, which did <u>not</u> include such an actual examination or inquiry as to such conditions and what those conditions would cause in terms of functional limitations, but consisted of just a review of medical records (which were not prepared to support a claim for long-term disability insurance benefits), MetLife determined that Ms. Snow did not qualify for long-term disability insurance benefits.

96.     Ms. Snow alleges the issue is not <u>whether her medical records</u> contain sufficient objective medical evidence of physical and/or mental impairment or refer to restrictions and limitations incompatible with her being able to work in her job or occupation.  Ms. Snow alleges the issue is whether the medical records <u>and all other</u> <u>evidence</u> provides evidence of the existence of medical conditions, impairments, sicknesses, or mental illnesses, which Ms. Snow suffers from, which could and do create or generate restrictions and limitations which would and do render her unable to perform one or more of the material and substantial duties of her regular occupation on a regular, full-time, productive and sustained basis.  And, in particular, whether Ms. Snow suffered from such restrictions and limitations which rendered her unable to work as of March 21, 2019 and thereafter on an ongoing basis.

97.     To determine the issue of whether a claimant's circumstances meet the Long-Term Disability Plan's definition of being disabled, a disability insurance carrier which <u>decides to not examine or even interview a claimant</u> or have her undergo

27

a functional capacity evaluation or a vocational assessment can certainly obtain and review a claimant's medical records (and it can inquire of the treating physician(s) whether the claimant's medical conditions would be expected to cause any restrictions or limitations, and, if so, whether such restrictions and limitations would render the claimant incapable of performing all of the material and substantial duties of her regular occupation on a full-time, productive and sustained basis).

98.     And, if the medical provider has prepared her or her medical records with a view of preparing such records to support (or not support) a claim for long-term disability insurance benefits, and if a physician has a solid understanding of the claimant's job, and the physical and cognitive and social requirements of the claimant's job, and then provides an evaluation of the claimant's medical conditions and whether such medical conditions cause restrictions and limitations, and whether such restrictions and limitations impact claimant's ability, or lack of ability, given those restrictions and limitations, to perform the material and substantial duties of the claimant's job and regular occupation on a full time, productive and sustained manner, and all of the above finds its way into the medical records, the disability insurance carrier can have confidence that reviewing only a treating physician's medical records will capture the reality of the claimant's ability to work in her regular occupation.

99.     But where, as in the instant case, a disability insurance carrier relies on medical records which do not directly address or measure, in objective medical terms, all of the claimant's impairments, restrictions and/or limitations, and how they might or do impact the claimant's ability to perform the material and substantial duties of her regular occupation, and does not examine the claimant, and does not interview the claimant,  and does not obtain relevant information from the claimant's treating physician(s) and employer or require the claimant to undergo additional objective testing or a functional capacity evaluation or a vocational assessment, all of which, Ms. Snow, on information and belief, alleges MetLife did <u>not</u> do with respect to the claim at issue herein, then the claimant can fairly allege that a denial made on the basis of such incorrect and incomplete information is arbitrary, capricious, an abuse of discretion and unreasonable.  Ms. Snow so alleges.

100.    Ms. Snow alleges that, under the circumstances of the instant case, MetLife's decisions to presumably deny Ms. Snow eligibility for long-term disability insurance benefits after March 21, 2019 were arbitrary, capricious, unreasonable and an abuse of discretion.

101.    Ms. Snow seeks the Court to grant declaratory relief to that effect.

**SECOND CAUSE OF ACTION**
**UNDER ERISA FOR RECOVERY OF BENEFITS**

102.   Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 101 above as if alleged in full herein.

103.   The B.D. Long-Term Disability Plan is subject to the ERISA.

104.   Ms. Snow is a participant or beneficiary in such Long-Term Disability Plan.

105.   Ms. Snow alleges her submissions to MetLife satisfy each of the criteria for eligibility for long-term disability insurance benefits under the Long-Term Disability Plan.

106.   Ms. Snow alleges she has provided medical evidence, both subjective and objective, that she suffers from one or more serious health conditions and impairments and sicknesses.  She has provided medical and other evidence which establishes that such medical conditions cause or result in functional limitations which, in turn, cause her to be unable to perform the material and substantial duties of her own job and occupation on a full time, regular, productive, sustained basis.

107.   Ms. Snow's treating physicians endorse and support Ms. Snow's claims for long-term disability insurance benefits.

108.   Ms. Snow alleges the totality of Ms. Snow's evidence (including doctors' records, FMLA paperwork, and MetLife forms) taken collectively, establishes that Ms. Snow's treating physicians have determined that Ms. Snow suffers from

medical conditions sufficient to cause substantial limitations in her ability to sit, stand, walk, lift, carry, push and pull, and to concentrate, think, remember, analyze, stay on task and follow through, such that her medical conditions preclude her from being able to perform the material and substantial duties of her job and occupation on a full time, regular, productive and sustained basis.

109.   Ms. Snow alleges that MetLife had an obligation under the Plan to review and, if necessary, develop additional medical and other evidence to address the questions (1) whether the claimant had a medical condition or conditions, (2) whether the medical condition(s) creates or results in limitations in functioning; and that (3) whether, due to such medical condition or conditions and such limitations in functioning, the claimant is unable to perform the material and substantial duties of her own job/regular occupation on a full time, productive and sustained basis.

110.   Ms. Snow alleges MetLife did not satisfy its obligations under the Plan.  MetLife based its decision on a file reviewer's opinion who did not perform any examination of or interview of Ms. Snow, who did not perform or order any additial objective tests, who did not arrange for a functional capacity evaluation, and who did not arrange for a vocational assessment, but who only reviewed medical records from treating providers (who did not intend, design or prepare their records to address the

issues of Ms. Snow's ability to work or inability to work or eligibility for long-term
disability benefits).

111.   MetLife has not supported its denial by referring to any medical
doctor who has actually examined or interviewed or tested Ms. Snow, who has come to
a different conclusion.

112.   MetLife has not supported its denial by referring to any functional
capacity evaluator who has actually examined or evaluated Ms. Snow's functional
capacity, who has come to a different conclusion.

113.   MetLife has not supported its denial by referring to any vocational
rehabilitation or placement counselor who has actually examined and reviewed Ms.
Snow's situation (age, education, training, work experience, current job, medical
history, and functional capacity), who has come to a different conclusion.

114.   Ms. Snow alleges the MetLife failed to comply with its obligations
under the B.D. Long-Term Disability Plan.

115.   Accordingly, Ms. Snow contends that MetLife's denial and
continuing denial of her claim for long-term disability insurance benefits after March
21, 2019 is contrary to the facts, contrary to her treating physicians' opinions, and
contrary to the weight of the totality of the evidence, and is, therefore, arbitrary,
capricious, an abuse of discretion and unreasonable.

116.    Ms. Snow alleges that, from March 21, 2019 to the present and ongoing, due to the serious health conditions/impairments described above, she was disabled from performing all of the material and substantial duties of her job and of her regular occupation (or any other occupation) and, therefore, qualified for such long-term disability insurance benefits.

117.    Ms. Snow alleges that she has satisfied all the conditions required of her by the above-named Plans to qualify for long-term disability insurance benefits.

118.    Ms. Snow alleges MetLife has failed, and is still failing, to pay the long-term disability insurance benefits due to Ms. Snow under the Plans.

119.    For the reasons set forth above, Ms. Snow alleges that MetLife's actions are arbitrary, capricious, an abuse of discretion, and unreasonable.

120.    By denying Ms. Snow eligibility for long-term disability insurance benefits after March 21, 2019, MetLife has deprived her of her rights to benefits under the Plan, in violation of ERISA § 502 (a) (1) (B) and 29 U.S.C. § 1132 (a) (1) (B).

121.    Such actions and inactions have caused Ms. Snow harm, injury, loss and damage.

122.    Such actions and inactions have also necessitated Ms. Snow to hire counsel and to incur attorney's fees and costs.

123.    Ms. Snow has exhausted all her administrative processes and remedies under the Plans or alleges that further pursuit of administrative remedies would be futile.

124.    ERISA provides means for Ms. Snow to be able to enforce her claim for long-term disability insurance benefits under the Plans.

125.    Defendant MetLife is liable to pay Ms. Snow the amount of long-term disability insurance benefits determined to be owed her from March 21, 2019 to the present, plus pre- and post-judgment interest, and the reasonable attorney's fees and costs she has incurred in bringing this action, all pursuant to 29 U.S.C. § 1132 (g).

WHEREFORE, Plaintiff prays for judgment against Defendant MetLife and seeks the following relief:

1.    A declaration that Ms. Snow was disabled under the Plan as of March 21, 2019 and continued to be disabled from that date to the present and continues to be disabled;

2.    For long-term disability insurance benefits under the Plan from March 21, 2019 forward;

3.    For pre- and post-judgment interest;

4.    For attorney's fees and court costs; and

5.    For such further relief as may be just and/or equitable.

34

DATED this 27th day of December, 2022.


       /s/ David J.  Holdsworth
      David J.  Holdsworth
      *Attorney for Plaintiff*

35

VERIFICATION

Tresea Snow, being first duly sworn, upon her oath, deposes and says that she is the Plaintiff in the above-entitled action, that she has read the foregoing COMPLAINT and understands the contents thereof, and the allegations made therein are true of her own knowledge, except as to those matters alleged on information and belief which she believes to be true.


_/s/ Tresea Snow_____
Tresea Snow


SUBSCRIBED AND SWORN to before me, a Notary Public, this ____ day of _____, 20___.


_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:       RESIDING AT: _____

_____